No. 02-693

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 354

HERBERT R. ORR and SANDRA G. ORR, et al.,

        Plaintiffs and Appellants,

    v.

STATE OF MONTANA, a government entity,

        Defendant and Respondent.

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark, Cause Nos. BDV 2001-423,
264, 523, 678, 667, 577; ADV 2001-623; CDV 2001-699
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

        Jon L. Heberling (argued), McGarvey Heberling Sullivan & McGarvey,
        Kalispell, Montana

        For Respondent:

        Dana L. Christensen (argued), Christensen Moore Cockrell Cummings &
        Axelberg, Kalispell, Montana; Thomas G. Bowe, Assistant Attorney General,
        Helena, Montana

        For Amicus Curiae:

        Lawrence A. Anderson, Attorney at Law, Great Falls, Montana; Karl J.
        Englund. Attorney at Law, Missoula, Montana (for Montana Trial Lawyers
        Association)

                Argued: June 26, 2003
             Submitted: November 12, 2003
               Decided: December 14, 2004

Filed:



Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     The Plaintiffs/Appellants (hereinafter "the Miners") include an on-site carpenter, seven former miners from Libby, Montana, and the wife of a former miner, all of whom have been diagnosed with asbestos disease. The Miners and their families have sued the State of Montana for negligence claiming that the State knew of the asbestos danger associated with working in the Libby vermiculite mine but failed to warn them, or protect them by requiring the mine owners to correct the unhealthful conditions. The District Court granted the State's Motion to Dismiss, concluding that the State had no legal duty to the Miners. The Miners appeal. We reverse and remand.

## ISSUES

¶2     The Miners present the following restated issues on appeal:

1.     Did the District Court err in ruling that the State had no statutory duties which ran to the Miners and their families?

2.     Did the District Court err in ruling that the State did not have a duty of care to the Miners and their families by a special relationship under the public duty doctrine?

3.     Did the District Court err in ruling that the State did not have a common law duty of care through foreseeability and an undertaking to provide industrial hygiene services for the benefit of the Libby mine workers and their families?

4.     Can the doctrine of federal preemption provide a defense for the State in this case?

5.     Does sovereign immunity insulate the State from the Miners' cause of action?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     The Plaintiffs/Appellants in this case include seven former Libby miners and the wife

2

of a former miner. The ninth Plaintiff is a carpenter formerly employed by a construction company who worked for the duration of his employment at the Libby mine. With due respect to the non-miner plaintiffs, we will refer to the entire group of Plaintiffs in this Opinion as "the Miners." The Miners have all been diagnosed with asbestos disease. The Miners' names and dates of work are: Herbert R. Orr, 1965-1967, Robert L. Graham, 1962-1990, Robert Dedrick, 1972-1973, Leonard D. Rice, 1968-1978, Donald R. Smith, 1951-1987, Opal A. Smith, (dates of husband Donald's work) 1951-1987, James D. Jacobson, 1975-1976, Royce N. Ryan, 1974-1977, and Clayton H. Riddle, 1959-1962 and 1966-1969.

¶4      W.R. Grace Co. (Grace) purchased the existing Zonolite mine and mill in Libby, Montana (the Mine), in 1963. It owned and operated the Mine until 1990. The Mine extracted vermiculite from the ground and processed it using a procedure which generated substantial airborne dust containing tremolite asbestos. In 1956, when the State Board of Health (the Board or BOH) conducted an industrial hygiene study of the Mine, it was already well-known that asbestos dust was a toxic inhalant. During the 1956 Mine inspection, the State did not perform analysis on any dust samples to determine an accurate asbestos concentration. Relying on the Mine's records, however, it concluded that the maximum concentration of asbestos in the airborne dust would not "be greater than 25 to 30 mppcf."[1]

---

[1] mppcf is the acronym for "millions of particles per cubic foot of air." At that time, according to the State's report, the maximum allowable concentration (MAC) of asbestos in airborne dust was 5 mppcf.

The State analyzed dust samples for asbestos concentration when it returned to the Mine in December 1958 and during subsequent inspections.

¶5     The State BOH performed inspections of the Mine in 1958, 1962, 1963, 1964, and 1967.  In 1966, the federal government undertook regulation of mine safety.  As a result, from 1971 through 1976, the federal agency, accompanied by a State mining inspector, inspected the Mine and issued written reports.  The State performed its own inspection in 1974, as well as assisting in the federal inspection for that year.  The federal inspectors did not participate in any inspections after 1976.  Between 1979 and the Mine's cessation of operations in 1990, the State performed fourteen inspections of the Mine.  It also performed two post-closure inspections in 1991 and 1992.

¶6     During each State inspection between 1956 and 1974, the State inspectors found unsanitary and unhealthful conditions.  The State notified Zonolite, and later Grace, of the dangerous conditions after each inspection, explaining the seriousness of asbestosis and its likely fatal outcome, but did not inform the Mine workers, including the Miners, of the dangers.  With the exception of identifying the hazardous conditions and telling the Mine's owners/managers to correct the problems, the State took no steps to ensure that the Mine's owners/managers responded in a manner that provided a safe working environment.  Moreover, federal inspections between 1971 and 1975, in which State inspectors participated, revealed dangerous levels of asbestos dust in the Mine.  The federal inspectors reported their findings to Grace, and provided copies of their reports to the State.  The State did not notify the Miners or other Mine workers of the federal findings.

4

¶7 The Miners originally sued Grace for its failure to provide a safe working environment. Grace successfully avoided financial responsibility for these claims, however, by filing for protection under Chapter 11 of the federal bankruptcy laws in April 2001. The Miners thereafter sued the State for its role in failing to protect them. They allege that the State negligently failed to warn them of the known dangers to all Mine workers and their families associated with working at the Mine, and that as a result of the State's negligence, the Miners have suffered grave injuries and damages.

¶8 The State countered that it did not owe a duty to the Miners, and without such a duty, there could be no finding of negligence. On this and several other grounds, it filed a Motion to Dismiss. Without reaching all of the grounds for dismissal presented by the State, the District Court agreed that the State owed no duty to the Miners and therefore granted the Motion to Dismiss. The Miners appeal. We reverse and remand.

## STANDARD OF REVIEW

¶9 We review *de novo* a district court's ruling on a motion to dismiss pursuant to Rule 12(b)(6), M.R.Civ.P. *Plouffe v. State*, 2003 MT 62, ¶ 8, 314 Mont. 413, ¶ 8, 66 P.3d 316, ¶ 8 (citation omitted). "A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. In considering the motion, the complaint is construed in the light most favorable to the plaintiff, and all allegations of fact contained therein are taken as true." *Plouffe*, ¶ 8 (citation omitted). We will affirm the District Court's dismissal when we conclude that the plaintiff would not be entitled to relief based on any set of facts that could be proven to support the claim. *Plouffe*, ¶ 8 (citation

omitted). The determination of whether a complaint states a claim is a conclusion of law, and the District Court's conclusions of law are reviewed for correctness. *Plouffe*, ¶ 8 (citation omitted).

## DISCUSSION

*Statutory Duty*

¶10   The first issue presented is whether the District Court erred in ruling that the State had no statutory duty which ran to the Miners and their families.

¶11   The Miners maintain that under the statutes empowering the State Board of Health and creating an Industrial Hygiene Division, the State had a mandatory duty to "make investigations" and "to disseminate information." They claim the State made the investigations as required but failed to disseminate the critical information derived from the investigations.

¶12   The State argues that, for the following reasons, it had no statutory duty to the Miners:

> 1.  the industrial hygiene laws, relied upon by the Miners, granted the State certain powers but imposed no mandatory duties;
>
> 2.  the industrial hygiene statutes did not expressly impose a duty upon the State to warn and protect the Miners;
>
> 3.  an Attorney General Opinion issued in 1942 ruled that facility inspection reports were confidential and could not be disclosed to the public;
>
> 4.  the industrial hygiene statutes restrict the State to reporting its inspection findings only "to the industries concerned"; and
>
> 5.  protection of workers is the exclusive responsibility of an employer under Montana labor laws, and that the Miners' theory of negligence would require "the

6

State to foresee that Grace would not fulfill its legal obligations as landowner and employer."

¶13 The District Court agreed with the State's arguments. It noted in its Order that none of the statutes relied upon by the Miners contained the words "mine," "asbestos," or "miners." This indicated to the court that "[t]he statutes deal with a general state of industry in Montana and with no specific form of industry or type of worker. With such being the case, it is hard to argue that the statutes . . . were designed to specifically provide a duty toward a certain type of industry or a certain type of worker." We turn now to an examination of the State's public health statutes which are at the center of the District Court's decision.

¶14 The State Board of Health was created in 1907. Section 1474, RCM (1907). Until 1967, when the State Department of Health (the Department or DOH) was created, the BOH was responsible for the "general supervision of the interests and health and life of the citizens of the state." Section 2448, RCM (1921); § 69-105, RCM (1947). As part of the BOH's "functions, powers and duties," the legislature mandated that the Board "shall make sanitary investigations and inquiries regarding the causes of disease; . . . causes of mortality, and the effects of localities, employments, conditions . . . and circumstances affecting the health of the people," among other things. The BOH was also charged to "gather such information in respect to all these matters as it may deem proper for diffusion among and use by the people. . . ." *See* Sec. 2448, RCM (1921); § 69-105, RCM (1947)(as revised in 1961, Replacement, Vol. 4).

7

¶15 In 1939, Montana legislators created, within the BOH, the Industrial Hygiene Division (the Division). The legislature granted to the new Division, among other things, the power to:

> (1) make studies of industrial hygiene and occupational disease problems in Montana industries; . . .
>
> (3) make investigations of the sanitary conditions under which men and women work in the various industries of the State; . . .
>
> (5) report to the industries concerned the findings of such investigations and to work with such industries to remedy unsanitary conditions.

Sections 2(1), (3) and (5), Ch. 127, L. 1939. Additionally, § 7 of the new law provided that:

> every physician, hospital or clinic superintendent, . . . having knowledge of a case of occupational disease shall . . . report the same to the division of industrial hygiene of the State of Montana . . . . All such reports and all records and data of the division of industrial hygiene of the State of Montana pertaining to such diseases are hereby declared not to be public records or open to public inspection, and shall not be admissible as evidence in any action at law or in any hearing under the workmen's compensation act of the State of Montana.

Section 7, Ch. 127, L. 1939. Chapter 127 was subsequently renumbered and codified at §§ 69-201-208, RCM (1947).

¶16 In 1955, Montana lawmakers effectively eliminated the Industrial Hygiene Division by decreeing that the BOH "shall possess, exercise and administer all of the powers, functions and authority, and shall carry out, discharge and execute all of the duties, in the field of industrial hygiene" set forth in §§ 69-202-208, RCM (1947). Section 69-201, RCM (1947)(1961, Replacement, Vol. 4). Sections 202 through 208 remained unchanged. As a

8

result, the BOH became exclusively responsible for the State's programs for general public health and safety as well as occupational/industrial health and safety.

¶17     In 1967, the Montana legislature made further revisions to both the public health and industrial hygiene statutes. It created the DOH.[2] Section 1, Ch. 197, L. 1967. As a result of the creation of the Department, the functions and duties formerly allocated to the Board were divided between the Board and the new Department. The DOH assumed the responsibility to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public." Section 69-4110(3), RCM (1947)(1969, 2d Replacement, Vol. 4). Moreover, the DOH became responsible for administering the industrial hygiene program. Section 69-4105(1), RCM (1947)(1969, 2d Replacement, Vol. 4). As a result, it was required to "investigate the conditions of work at any place of employment at any time," and to "report the findings of investigations to the industry[3] concerned and co-operate with the industry in preventing or

---

[2] Subsequently known as the Department of Health and Environmental Sciences, § 69-4102(2), RCM (1947)(Supp. 1977) and the Department of Public Health and Human Services, § 50-1-101(2), MCA (1997).

[3] We note that the dissent accuses the Court of relying on "incomplete references and misleading quotations" from past statutes. One such statute to which the dissent refers is § 69-4203(4), which, as quoted here, contains the language required for the dissent's analysis. In this instance, the dissent apparently narrowly defines the word "industry" as used in § 69-4203(4) to mean the employer or the management group of a facility as opposed to the workers and laborers who, in actuality, make up an industry. The term "industry" is not defined in the statute; therefore it must be given its ordinary meaning. *Mont. Vending, Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, 318 Mont. 1, 78 P.3d 499. Without supporting authority, the dissent defines the term "industry" to *exclude* the workers who comprise it. Applying this narrow definition to a Department of Health program designed to safeguard the health of these very workers runs contrary to its purpose.

correcting conditions which are hazardous to health." Section 69-4203(3) and (4), RCM

(1947)(1969, 2d Replacement, Vol. 4).

¶18    In 1971, the industrial hygiene statutes underwent further revisions. The new statute

was known as the Occupational Heath Act (OHA) of Montana. Section 1, Ch. 316, L. 1971;

§ 69-4206, RCM (1947)(Supp. 1977). The declared policy and purpose of the OHA was:

> (1) . . . to achieve and maintain such conditions at the workplace as will
> protect human health and safety, and to the greatest degree practicable, foster
> the comfort and convenience of the workers at any workplace of this state and
> enhance their productivity and well-being.
>
> (2) To these ends it is the purpose of this act to provide for a co-ordinated
> statewide program of abatement and control of occupational diseases . . . .

Section 69-4207, RCM (1947)(Supp. 1977).

¶19    The new Act mandated that, among other things, the BOH[4] adopt rules implementing

the Act, establish threshold limit values of airborne contaminants, and issue orders necessary

to carry out the Act. Under the OHA, the Department was granted various "powers." These

included the requirement that the DOH enforce orders issued by the Board, prepare and

develop a comprehensive plan for the prevention, abatement, and control of occupational

diseases, and that it "collect and disseminate information and conduct educational and

training programs relating to the prevention and control of occupational diseases." Section

69-4211.1(1), (3), and (7), RCM (1947)(Supp. 1977). The Department also had the power

---

[4] Renamed the Board of Health and Environmental Sciences by the OHA. Section 69-4208(11), RCM (1947)(Supp. 1977).

to take enforcement actions and impose monetary penalties on violators of the OHA. Section 69-4215 and 69-4221, RCM (1947)(Supp. 1977).

¶20    In addition, the OHA set out a specific "emergency procedure" to be implemented by the Department upon discovery of "a generalized hazard at a workplace" that "creates an emergency requiring immediate action to protect human health." Section 69-4216(1), RCM (1947)(Supp. 1977). Under such circumstances, the Department was required to order the persons causing or contributing to the hazard to "reduce or discontinue immediately the emissions creating the hazard." Section 69-4216(1), RCM (1947)(Supp. 1977). In the absence of a general condition creating an emergency, the Department was granted the discretion to order the persons responsible for "emissions from an operation . . . causing imminent danger to human health" to reduce or discontinue such emissions immediately. Section 69-4216(2), RCM (1947)(Supp. 1977).

¶21    In 1978, the OHA was renumbered and became § 50-70-101 *et seq*, MCA. The section that had formerly referenced "Powers" of the Department now described "Duties" of the Department. As had been the language in previous versions, the Department was instructed that it "shall" perform these duties, including the duty to "collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases . . . ." Section 50-70-105(7), MCA (1978). In 1999, this obligation became discretionary after the legislature changed the language from "shall" to the more permissive "may." Section 50-70-105(7), MCA (1999).

¶22    The District Court concluded that none of the above-referenced statutes imposed a duty on the State to protect the Miners by warning them of the known dangers of working at the Libby Mine.  The court, as noted above, found significance in the fact that none of these statutes specifically or expressly used the words "mine," "asbestos" or "miners."  The court apparently concluded that because the statutes were not particular to vermiculite mines, they were not applicable to vermiculite mines.  We disagree with this conclusion for several reasons.  First, it cannot be disputed that vermiculite mining is "an industry." If the failure of the legislature to describe every industry to which its law applies is followed to its logical conclusion, then the law would cover no industries whatsoever.  This is an absurd interpretation.  A well-established maxim of our jurisprudence is that "[a]n interpretation which gives effect is preferred to one which makes void."  Section 1-3-232, MCA.

¶23    Second, while it is true that the statutes in their various forms specified obligations running from the Board or Department to the industries themselves, the duty to gather information related to the effects upon workers or the public of conditions of employment "for diffusion among and use by the people" was never displaced or eliminated from the law.  The State had the mandatory obligation from 1907 through 1999 to gather public health-related information and provide it to the people.  Section 2448, RCM (1921); § 69-105, RCM (1947); renumbered in 1969 to § 69-4110(3), RCM (1947); renumbered in 1978 to § 50-1-202(2), MCA.  The legislature wrote this law broadly and chose not to limit it to specific industries, occupations or workers.

¶24 The dissent maintains that the Court establishes the existence of a duty "by incomplete references and misleading quotations from statutes of yesterday." It specifically references our reliance on the phrase "for diffusion among and use by the people," arguing that by "ripping [this] phrase" from the statute, the Court removed it from its context and from its meaning. The dissent neglects to note that in ¶ 14, when first describing this statute, we included the language deemed critical to the dissent's analysis, *i.e.*, the State BOH "shall gather such information in respect to all [statutorily-listed] matters as it may deem proper for diffusion among and use by the people . . . ." Section 69-105, RCM (1947)(as revised in 1961, Replacement, Vol. 4). A close reading of this statute can result in different interpretations depending upon whether the words "as it may deem proper" are paired with the beginning of the sentence or the end of the sentence. As a result, the plain language of the statute is ambiguous and must undergo statutory construction. *Sink v. School Dist.*(1982), 199 Mont. 352, 360, 649 P.2d 1263, 1267. (If possible, legislative intent must be inferred from the plain meaning of the words contained in statutes; only if there exists ambiguity in such wording should the court resort to the rules of statutory construction.)

¶25 Courts have developed many principles for interpreting statutes. Each principle is designed to give effect to the legislative will, to avoid an absurd result , to view the statute as a part of a whole statutory scheme and to forward the purpose of that scheme. *See State v. Heath*, 2004 MT 126, 321 Mont. 280, 90 P.3d 426. In the case before us, we conclude that the appropriate method of statutory construction is to apply the grammatical rule of the "last antecedent," which has been adopted by this Court. "Under the doctrine of the 'last

13

antecedent' relative clauses in a statute must be construed to relate to the nearest antecedent that will make sense; qualifying words and phrases should be applied to words or phrases immediately preceding, unless an extension or inclusion of others more remote is clearly required by a consideration of the entire Act." *State ex rel. Peck v. Anderson* (1932), 92 Mont. 298, 13 P.2d 231; *Butte-Silver Bow Local Govt. v. State* (1989), 235 Mont. 398, 405, 768 P.2d 327, 331. Applying this rule here, we conclude that the words "as it may deem proper" are clearly intended to relate to the words preceding them rather than the words following them. As a result, we construe the statute to mean that the State had the discretion to determine what information to gather, but once that information was gathered, it had no discretion about whether to distribute it. We believe this construction forwards the purpose of the entire statutory scheme which was to create a State entity having "general supervision of the interests and health and life of the citizens of the state," presumably for the protection of those citizens.

¶26 Finally, the District Court's conclusion that the statutes do not apply to vermiculite miners is belied by its conclusion reached elsewhere that the industrial hygiene statutes obligated the State to report only to the industries concerned, and not their employees. Without belaboring the obvious, if the statutes are to be construed to protect the industries, then, by implication, they obviously apply to the Miners.

¶27 The District Court also placed great weight on Attorney General Bonner's Opinion issued in 1942. The Attorney General was asked by the then-Secretary of the BOH whether the State's reports of the workplace investigations should be furnished to anyone requesting

14

them. Attorney General Bonner responded by quoting § 7 of Chapter 127 (See ¶ 15 above), and concluding that the BOH's reports are "not public records nor are they open to public inspection. They are, therefore, confidential in character." Both the State and District Court emphasize that for years, subsequent legislatures did not change this provision nor express their disagreement with Attorney General Bonner's conclusion.

¶28    It is difficult to understand how the Attorney General then, and the State and the District Court in the instant litigation, could conclude that a prohibition against the publication of the medical records of a person with an occupational disease was tantamount to a prohibition against dissemination of the results of a workplace investigation. The Secretary of the BOH sought an opinion on whether to furnish the results of workplace investigations to those requesting them; he did not ask if he could disseminate medical records. The Attorney General's response to the Secretary's inquiry was a *non sequitur*. Given the disparity between the opinion sought and the answer provided, it is somewhat bewildering that this Opinion was relied upon for years to justify the concealment of the results of workplace inspections.

¶29    It is apparent that § 7 of Chapter 127 was written to protect the confidentiality of a patient's medical records, not to prohibit the State from disclosing information derived during workplace inspections. This interpretation is reinforced by the section title given when § 7 was codified and renumbered as § 69-207, RCM (1947)--"Duty of physicians and others to report cases - reports private records." As we have frequently held, "[t]he title of an act is presumed to indicate the legislature's intent." *Dept. of Rev. v. Puget Sound Power*

15

*& Light,* 179 Mont. 255, 263, 587 P.2d 1282, 1286. This presumption applies equally to titles of sections within an act. As written in 1939 and revised to date, the section protects the privacy of a person diagnosed with occupational disease and prohibits health care workers from disclosing this person's medical records or anyone from using these private medical records as public documents. It balances the need of the State to know of such occupational disease diagnoses against the individual patient's right to privacy. Section 7 clearly does not, however, apply to or constrain the dissemination of the results of workplace inspections.

¶30    It seems clear that either Attorney General Bonner misinterpreted the question, or the BOH misconstrued the answer. The unfortunate result of their individual or combined failings was the State's decision to withhold from the workers at the Libby Mine investigation reports that revealed that they were being exposed to deadly toxins on a daily basis. Moreover, the language of the original § 7 interpreted by Attorney General Bonner was significantly revised by the legislature in 1967. The result of the legislative revision was to clarify § 7 in a manner that continued to prohibit health care workers from disclosing private medical records but that rendered Attorney General Bonner's Opinion moot.

¶31    We next address the State's argument that protection of workers is the exclusive responsibility of an employer under Montana labor laws, and that the Miners' theory of negligence would require "the State to foresee that Grace would not fulfill its legal obligations as landowner and employer." We conclude that the State's argument is disingenuous.

16

¶32 In August 1956, when the State inspected the Mine "to determine if any of the components of the operation . . . were detrimental to the health of the employees," it discovered significant quantities of airborne dust. It knew that there was an unknown concentration of asbestos in the dust but did not analyze the dust to determine an exact asbestos content at that time. It did, however, using Zonolite's estimated concentrations of 25 to 30 mppcf, report to Zonolite the dangers and toxicity associated with breathing asbestos particles.

¶33 The State returned to the Mine in December 1958 to determine if the components of the Mine's operation identified in 1956 as detrimental to the Workers had been reduced or alleviated. During the inspection, it analyzed the asbestos content of the dust in several locations in the plant and discovered that the concentration of asbestos particles was significantly greater than the maximum allowable concentrations established by official federal public health agencies. In February 1959, a Zonolite employee was diagnosed with far advanced pulmonary tuberculosis and questionable asbestosis. He spent several days in the State Tuberculosis Sanitarium in November 1959 and died of asbestosis-related congestive heart failure in October 1961. Additionally, another Zonolite employee died in October 1961 of atherosclerosis and pulmonary fibrosis.

¶34 The State BOH inspected the Mine again in March 1962 and discovered that the Mine's environmental health had deteriorated significantly. Of twenty discrete dust samples, fifteen produced asbestos levels far in excess of the MACs. Two samples exceeded the allowable limits by more than seven times while nine other samples exceeded the limits by

17

four to six times. The State Industrial Hygiene engineer even noted in his letter submitting the report to Zonolite that the State was "disappointed with the lack of progress made in dust control."

¶35    The State investigated the Mine again in April 1963. Of eight dust samples analyzed for asbestos content, all eight had asbestos concentrations from two to six times greater than the MACs. In early 1964, another Mine employee died from asbestos-related congestive heart failure.

¶36    In sum, between 1956 and early 1964, the State inspected the plant four times; it received the death notices of three Mine employees from asbestos-related diseases, and had identified a deteriorating and increasingly dangerous workplace. Surely, the State would have noted in its 1958 and 1963 reports if Zonolite or Grace had posted warning signs to employees, provided safety equipment, arranged for medical monitoring, or established safety procedures to protect the employees from ever-increasing concentrations of asbestos in airborne dust.

¶37    The State argues that it could not *foresee* that the Mine owner would not fulfill its legal obligations as landowner and employer. This rings hollow in light of obvious and objective indications that neither Zonolite nor Grace was protecting its employees. Plainly, the State *knew* as a result of its inspections that the Mine's owner was doing nothing to protect the workers from the toxins in their midst. The question of whether the risks were foreseeable had been answered as early as 1956; the dangers to the workers were already clear and present by that time. In fact, the District Court specifically found:

18

[I]t could be fairly said that since 1956, the state of Montana was on notice that the asbestos dust at the Libby mine was dangerous and that the mine owner was not making improvements as recommended by the State. Also, it appears that the record is bereft of any actions taken by the State to warn the miners or the Libby townspeople of their plight.

¶38 The State's argument that it owed no duty to the Miners ignores the State's statutory obligation to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public." Section 69-4110(3), RCM (1947)(1969, 2d Replacement, Vol. 4). More significantly, the State's argument that it had no duty to the Miners disregards the provisions of § 69-4202, RCM (1967-1971), which required the State to "correct or prevent conditions which are hazardous to health at any place of employment." Obviously, hazards to health at a place of employment can only affect the people who work there. The provisions of this law bound the State to do something to correct or prevent workplace conditions known to be hazardous to health.

¶39 The statutory duties of the State thus ran to the public and to persons whose employment subjected them to health hazards. Had the legislature intended to limit the State's role to that of industry advisor, presumably it would have both expressed that intent *and* avoided declarations of duties to others. It did neither. We cannot "omit what has been inserted" into these statutes. Section 1-2-101, MCA.

¶40 Having concluded that the State had statutory duties to the public and to persons confronted with workplace health hazards, we turn next to the question of whether

19

application of the Public Duty Doctrine would preclude a finding of liability on the part of the State to the Miners.

***The Public Duty Doctrine***

¶41     The State argued, and the District Court agreed, that the principles of the Public Duty Doctrine (PDD) would preclude a finding of liability on the part of the State to the Miners. *Citing Nelson v. Driscoll* (1999), 295 Mont. 363, 983 P.2d 972, the court concluded that a duty to the public is a duty to no one in particular, and is thus not enforceable in a negligence action.  While acknowledging that an exception to the PDD exists when there is a special relationship between the government agency and the plaintiffs giving rise to a special duty, the court concluded that no special relationship existed in this case.  The Miners, on the other hand, contend that a special relationship did exist between them and the State, and that the Public Duty Doctrine would therefore not preclude a finding of liability on the part of the State.

¶42     As we explained in *Nelson*, a special relationship giving rise to a special duty can arise in one of four circumstances.  Such a relationship can be established (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.  *Nelson*, ¶ 22.

¶43 The District Court concluded that no special relationship existed because: (1) the statutes were too general to protect a specific class of persons from a particular type of harm; (2) the government did not undertake a specific action to protect a person or property; and (3) the Miners could not establish that they detrimentally relied upon the government's inspections. We disagree with the District Court's conclusions.

¶44 The numerous statutes discussed above were intended to protect workers from occupational diseases. As we stated above, the lack of specificity in these statutes does not render them meaningless. The statutes were designed to protect men and women working in the various industries in Montana from occupational disease. Libby Miners are undeniably members of this specific class of persons.

¶45 Secondly, the State repeatedly returned to this specific Mine, year after year, for the express purpose of determining "if any of the components of the operation of [the Mine] were detrimental to the health of the employees." And as the District Court expressly found, this question was answered in the affirmative. Such a recurring undertaking--at this place in particular--surely qualifies as a "specific action to protect a person" and creates a special relationship between the State and the Miners.

¶46 Lastly, the Miners presented affidavits indicating that they were concerned about the ambient dust, but had concluded that the dust did not pose any health risks or danger. This conclusion was uniformly premised on the fact that the State had regularly inspected the Mine, but had never reported any danger to the Miners. Each Miner declared that they relied on these State inspections and the State's lack of warning to continue working at the Mine.

21

In Montana, reliance occurs when one is "rightfully led to a course of conduct or action on the faith that the act or duty will be properly performed." *Nelson*, ¶ 36. The State's inspections "rightfully led" the Miners to believe that they were working in a safe environment.

¶47 Under these circumstances, we conclude that the State had a statutory duty under § 2(5), Ch. 127, L. 1939, § 69-202(5), RCM (1947), § 69-4203(4), RCM (1947)(1969, 2d Replacement, Vol. 4), § 69-105, RCM (1947), § 69-4105(1), RCM (1947)(1969, 2d Replacement, Vol. 4), and § 69-4110(3), RCM (1947)(1969, 2d Replacement, Vol. 4) to protect the safety and health of the Miners by warning them of known dangers associated with their workplace. We also conclude that, by virtue of the special relationship between the State and the Miners, the State is not shielded by the application of the Public Duty Doctrine.

*Common Law Duty*

¶48 The Miners ask that we also determine whether the District Court erred in ruling that the State did not have a common law duty of care to them. Having determined that the State of Montana had a statutory duty to the Miners, it is unnecessary that we determine whether the State also had a common law duty.

*Federal Preemption*

¶49 The Miners also challenge the District Court's failure to rule on the applicability of the doctrine of federal preemption to this case. The State claimed federal preemption in the District Court and Miners moved for partial summary judgment to strike the preemption

22

defense. However, the District Court dismissed the case without ruling on the issue. The Miners request on appeal that this Court establish whether the doctrine of federal preemption applies to this case. Because this issue will, in all likelihood, be raised again upon remand, in the interest of judicial economy and resolution of this case, we address it now.

¶50 Both the United States Supreme Court and this Court disfavor preemption. "Because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action. In all preemption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Sleath v. West Mont Home Health Services,* 2000 MT 381, ¶ 23, 304 Mont. 1, ¶ 23, 16 P.3d 1042, ¶ 23 (*citing Medtronic*, *Inc. v. Lohr* (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700, 715 and *Cipollone v. Liggett Group, Inc*. (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422). This presumption against preemption "can only be overcome by evidence of a 'clear and manifest' intent of Congress to preempt state law." *Sleath*, ¶ 61 (*citing Wisconsin Public Intervenor v. Mortier* (1991), 501 U.S. 597, 610, 111 S.Ct. 2476, 2484, 115 L.Ed.2d 532, 546).

¶51 As we stated in *Favel v. American Renovation and Const. Co.*, 2002 MT 266, 312 Mont. 285, 59 P.3d 412, in determining whether a federal law preempts a state law, including a common law cause of action, we look for evidence of Congressional intent to do so. As noted by the Miners, and explained in *Favel*, there are three ways in which state law may be superseded by federal law. First, Congress may expressly include a preemption clause in the

23

federal statute. Such an express clause would make it clear that state law will not apply in the area governed by the federal statute. Second, congressional intent may be implied where it is reasonable to conclude that Congress intended to "occupy the field" by such comprehensive regulation that there is no room for supplementary state regulation. Lastly, federal law may preempt state law when the state and federal law actually conflict with one another. Such a conflict occurs when it is impossible to comply with both the federal and state law, or because "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Favel*, ¶ 40 (*citing Hillsborough County v. Automated Medical Labs.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721; *see also, Suislaw Concrete Const. v. Wash., Dept. Of Transp.* (9th Cir. 1986), 784 F.2d 952, 955).

¶52 The Miners argue that prior to 1966 no federal statutory or regulatory scheme governing the Libby Mine existed. As a result there can be no federal preemption defense available to the State for its Mine-related activities prior to 1966. In 1966, Congress passed the Federal Metallic and Non-Metallic Mine Safety Act (the FMNMSA). In looking for Congressional intent vis-à-vis preemption, we note the following provision in the FMNMSA:

> **(a) Conflict with this chapter**
> No State or territorial law in effect upon the effective date of this chapter or which may become effective thereafter, shall be superseded by any provision of this chapter, except insofar as such State or territorial law is in conflict with this chapter, or with orders issued pursuant to this chapter.

30 U.S.C. § 738(a). This provision was carried forward to the Federal Mine, Safety and Health Amendments of 1977 that repealed the FMNMSA and consolidated non-coal mine

24

safety with coal mine safety. 30 U.S.C. § 955(a). Just as preemption will be found only in those situations where it is "the clear and manifest purpose of Congress," (*Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 91 L.Ed. 1447, 1459, 67 S.Ct. 1146, 1152), it will not be found when there is a clear intent to the contrary. Because Congress affirmatively disclaimed any intention to preempt state law with the FMNMSA or the amendments, there is no need to further analyze this issue. We conclude the FMNMSA and its amendments do not preempt state law in this case.

### *Sovereign Immunity*

¶53    Lastly, the Miners ask that we determine whether sovereign immunity applies to this case. While the District Court dismissed Miners' Complaint without addressing this issue, as with the issue of federal preemption above, it is appropriate that we resolve it prior to remand. To our knowledge, this is a matter of first impression for this Court. For background, a brief discussion of sovereign immunity is warranted.

¶54    Originally, sovereign immunity protected the early kings of England from suit in the King's Court. However, the doctrine evolved into protecting governmental entities from liability for the negligent acts of their officers and employees. It was adopted by this country's legal system during the nineteenth century. Barry L. Hjort, *The Passing of Sovereign Immunity in Montana: The King is Dead!* 34 Mont. L. Rev. 283 (1973). The first Montana case embracing sovereign immunity was *Langford v. King* (1868), 1 Mont. 33, 38, holding that citizens may not sue the territorial government absent the government's consent. The Montana Constitution of 1889 neither authorized nor prohibited sovereign immunity.

25

Thus, Montana courts, as did other courts throughout the country, struggled throughout the twentieth century to apply the doctrine with consistency and reason. *Hjort* at 289-93. In 1972, the Delegates to the Montana Constitutional Convention joined several other states in concluding that the doctrine was an anachronism. The Delegates inserted Art. II, § 18, into the Declaration of Rights of the Montana Constitution. Article II, § 18:

> **State subject to suit**. The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property. This provision shall apply only to causes of action arising after July 1, 1973.

Article II, § 18 became effective on July 1, 1973. However, the last sentence of this Section was deleted in 1975, as a result of voter initiative. It is against this historical backdrop that the sovereign immunity issue in this case arises.

¶55 However, before presenting our analysis, we find it necessary to address remarks contained in the dissent. The dissent maintains, without citation to authority, that sovereign immunity is not merely a bar to suit but is actually a legal doctrine to the effect that the government owes no duty to its citizens. This is incorrect. Immunity is a matter of avoidance, an affirmative defense. *Brown v. Ehlert* (1992), 255 Mont. 140, 146, 841 P.2d 510, 514. The sovereign immunity defense does not mean that there is an absence of duty; rather, at the time that the immunity defense exists, the breach of duty is simply not actionable against the sovereign. The statutory scheme in effect in the 1960's is illustrative. Prior to the abrogation of sovereign immunity, § 40-4402, RCM, adopted in 1963, provided that an insurer for the state or its political subdivision who received a premium from the state

26

for liability insurance, could not--in a suit against the state--"raise the defense of immunity from suit in any damage action brought against such insured or insurer [under certain circumstances]. . . and if the verdict exceeds the limits of the applicable insurance, the court shall reduce the amount of such judgment or award to a sum equal to the applicable limit stated in the policy." *See Jacques v. The Montana National Guard* (1982), 199 Mont. 493, 505-06, 649 P.2d 1319, 1326.  If, as the dissent posits, sovereign immunity meant there was no duty owed by the State, then there would be no reason for the existence of this statute, because no cause of action, much less an adverse verdict, could have gone forward against the State under any circumstance.

¶56    The State argued that because all but one of the alleged negligent acts complained of by the Miners occurred before July 1, 1973, it should be immune from liability for those breaches of duty.  The Miners responded that the sovereign immunity law in effect at the time the State's breach of duty occurred is irrelevant; the applicable sovereign immunity law is the one in effect at the time their tort claim accrued.  They maintained that because the tort of negligence requires four elements--duty, breach of duty, causation and damages--their claim did not accrue until their "damages" became manifest in 1998, when they were medically diagnosed with asbestos-related illnesses.  Therefore, they asserted that it is the sovereign immunity law in effect in 1998 that is applicable to their case.

¶57    The precise question of whether pre-1972 or post-1972 sovereign immunity law controls in this unique situation has not been squarely presented to or answered by this Court.  The obvious reason for the absence of authority in this area is that, typically, the

27

elements of a tort happen, and the cause of action accrues, at the same moment in time. A vehicle strikes a pedestrian, a man falls from a faulty scaffolding, a nursing home employee injures her back while lifting a patient--in each of these instances, the wrong occurs and the damage immediately results. Here, the wrongs occurred in the 1960's but the damages did not manifest until 20 years later. In other words, the elements of the tort did not occur simultaneously. At least one Montana case suggests that, when the elements of the tort are bisected by the abrogation of sovereign immunity, it will be the law in effect at the time the injury occurs that applies.

¶58    In *Jacques*, the defendant State of Montana appealed from a verdict entered in favor of Jacques and against the Montana National Guard and the State of Montana for injuries sustained by the plaintiff in an explosion that occurred in February of 1977. The Plaintiff, employed at the Anaconda Smelter, had his legs traumatically amputated when a large shell that a co-worker had found nearby, exploded. According to the testimony, the shell had been left by the National Guard in an old firing range nearby, between the years 1956 and 1966. However, the shell remained on the ground undetonated until 1977. Thus, sovereign immunity was in full force and effect at the time that the tort or the wrong occurred, which was when the explosive shells were negligently left on the ground by the National Guard. The damage was not sustained by the plaintiff, however, until the explosion occurred five years after the abolition of sovereign immunity, in 1977.

¶59    The State in *Jacques* argued that the law in effect prior to the abrogation of sovereign immunity should control, thereby limiting its exposure to the applicable insurance limits in

28

effect as of 1963. The Court, however, refused to do so, concluding that because sovereign immunity had been abolished in 1972, sovereign immunity, and statutes related to it, could not be raised as a defense. Thus, while the tortious breach of duty obviously occurred between 1956 and 1966, the court declined to apply the law in effect at the time of the wrong and instead applied the law in effect at the time the damage occurred.

¶60    Three courts from other jurisdictions have examined cases under the unusual circumstances presented here. We look to them for additional guidance. *State v. Ford*, 2001 MT 230, ¶ 22, 306 Mont. 517, ¶ 22, 39 P.3d 108, ¶ 22.

¶61    In March 1944, a military plane crashed just outside of Birmingham, Alabama. A 14-year old boy, Carnes, and his friends went to the crash scene shortly after the crash occurred. They also visited the scene several other times during the cleanup operations, during which time guards were posted. The boys were allowed to take "souvenirs" from the site. Unbeknownst to Carnes and his parents, he had salvaged an explosive device that, in February 1945, exploded and seriously injured him.

¶62    The trial court held that because the negligent act of the Government had occurred before January 1, 1945, the Government was immune and the court had no jurisdiction. The Tenth Circuit disagreed because the boy's cause of action accrued when his injury occurred, which was after January 1, 1945. The language of the court is helpful:

> Actionable negligence consists of the violation of a duty to another with resulting injury to him. This is elementary and needs no citation of authorities to support it. The correct rule is well stated in *Schmidt v. Merchants Despatch Transportation Company*, 200 N.Y. 287, 200 N.E. 824, 827, 104 A.L.R. 450, where the court said: "We have said that 'in actions of negligence damage is

of the very gist and essence of the plaintiff's cause.' . . . . Though negligence may endanger the person or property of another, no actionable wrong is committed if the danger is averted. It is only the injury to person or property arising from negligence which constitutes an invasion of a personal right, protected by law, and, therefore, an actionable wrong."

Appellant did not have a claim against the Government until he suffered injury upon which he could have predicated an action in court. It will be noted that the Act gives the court jurisdiction of actions *on claims* (10th Cir. emphasis) accruing on or after January 1, 1945. The claim accrued, if at all, on February 2, 1945, when appellant was injured. Prior to that time he had no claim against the Government. He could not have sued the Government. His cause of action, if any he had, accrued on the date he suffered his injury. Under the clear language of the Act, the court had jurisdiction of the cause of action predicated upon this claim.

*Carnes v. United States* (10th Cir. 1951)*, 186 F.2d 648, 650. *See also Diminnie v. United States* (6th Cir. 1984), 728 F.2d 301 (Plaintiff's claims for assault, battery, false imprisonment, false arrest, and malicious prosecution all accrued at the time of his original arrest and indictment in 1973. Therefore, the Federal Bureau of Alcohol, Tobacco and Firearms was immune from suit because the FTCA had not yet been enacted.)

¶63 In *Windham v. Florida Dept. of Transp.* (1985), 476 So.2d 735, the First District Court of Appeals of Florida was asked to review a trial court's decision dismissing the plaintiffs' complaint for damages and injuries arising from contaminated groundwater. According to the facts, in 1959, the Florida DOT hired a contractor to pave a section of Florida highway. The contractor used trichloroethylene (TCE) to clean his equipment and when he finished, he buried the drums of TCE in the ground without any attempt to safeguard against their leakage. At the time these drums were buried, the State of Florida enjoyed sovereign immunity.

30

¶64    In 1974, the Florida legislature passed a statute that waived sovereign immunity for "incidents occurring on or after" January 1, 1975.

¶65    In 1976, the Windhams bought the property adjacent to this unknown drum burial ground and drilled a well.  For six years, they drank water from this well.  They began experiencing various health problems and their first born child was born with a rare form of eye cancer requiring surgical removal of the infant's eye.  In 1982, the environmental regulatory agency sampled their water and found the odorless, colorless, and tasteless TCE. The Windhams sued the State of Florida DOT for various torts, including negligence. *Windham*, 476 So.2d at 736.

¶66    The court concluded the State was immune from suit because the "negligent acts or omissions such as those alleged here, occurring prior to the statute's effective date, may not be utilized as the basis for a cause of action for injuries materializing after the effective date." *Windham*, 476 So.2d at 739.  The Florida court reached its conclusion by interpreting the language of the 1974 statute that waived sovereign immunity.  It concluded that the term "incident" is defined as "occurrence" or "happening," and determined that the "incident" in the *Windham* case was the wrongful act causing the injury, not the actual injury itself. *Windham*, 476 So.2d at 739.  Moreover, the Florida court concluded that interpreting "incidents occurring" as synonymous with "causes of action accruing" would be inconsistent with other provisions of the same state statute which specifically addressed accrual of actions.  *Windham*, 476 So.2d at 739.

31

¶67    Justice Ervin wrote a strong dissent wherein he vociferously disagreed with the majority opinion that he said "bifurcates the traditional definition of negligence." He stated, "the majority states that the duty and breach thereof . . . can be separated from the actual injury sustained by plaintiff's minor child. This construction . . . is at variance with common principles of tort law . . . . It is axiomatic that no cause of action can exist for negligence, even assuming the existence of the negligent act, where no damage can be proven." *Windham*, 476 So.2d at 742.

¶68    These cases illustrate that courts first look to the precise language of the immunity waiver statute to determine when a governmental entity is immune from liability, and when it is not. This rule of statutory construction is familiar to this Court. "General rules of statutory construction require this Court to interpret the statutory language before us, without adding to, or subtracting from, it. Section 1-2-101, MCA. Words and phrases used in statutes of Montana are construed according to the context and the approved usage of the language. Section 1-2-106, MCA. Therefore, when interpreting statutes, this Court will use the plain and ordinary meaning of a word." *Carroll v. W.R. Grace & Co.,* (1992), 252 Mont. 485, 487, 830 P.2d 1253, 1254.

¶69    Montana, of course, did not waive immunity by statute but rather by constitutional provision. This distinction, however, does not change how we interpret the language. Looking closely at the language adopted by the Delegates, "[t]he state . . . shall have no immunity from suit for injury to a person . . .," we conclude that the critical phrase we must interpret is "suit for injury." According to the Webster's Dictionary, a suit is "an action or

32

process in a court for the recovery of a right or claim." Black's Dictionary, 7th Edition, defines suit as "any proceeding by a party or parties against another in a court of law." Certainly, under the common usage of the words, the Miners' claim qualifies as a "suit for injury."

¶70 The State seeks to bifurcate its alleged negligent acts from any injuries they ostensibly caused. It maintains that because it was immune at the time it purportedly committed the acts, it retained that immunity from "suits for injury" regardless of when the suit or injury arose. We disagree and for the reasons stated below, conclude that the Delegates' choice of the phrase "suit for injury" incorporated the legal concept of "accrual."

¶71 More than one hundred years ago and prior to statehood, Montana codified the law relative to commencement of a civil action and a statute of limitations.

> Civil actions can only be commenced within the periods prescribed in this article, **after the cause of action shall have accrued**, except where, in special cases, a different limitations is prescribed by statute. (Emphasis added).

Section 28, Laws of Montana, C.Civ.Proc. 1879. With minor language revisions and frequent renumbering, this statute remains essentially unchanged. *See* Sec. 470, MCA, C.Civ.Proc. 1895; § 6428, RCM (1907); § 9011, RCM (1921) and (1935); § 93-2401, RCM (1947); § 25-1-102, MCA (2003). "Cause of action" is defined by Black's Law Dictionary, 7th Edition, as "a group of operative facts giving rise to one or more bases for suing." By the time of the Constitutional Convention in 1972, one hundred years of Montana jurisprudence stood for the proposition that a "suit for injury" could only be commenced upon an accrued

33

cause of action. Thus, the State has no immunity for causes of action accruing after July 1, 1973. Next, we must determine when the Miners' cause of action accrued.

¶72    Usually, all of the elements of a negligence claim occur in rapid succession. A duty is breached and the plaintiff is immediately injured as a result. With asbestosis, the paradigm is far different. There is no dispute that asbestosis can take years to manifest. One person exposed to the toxins in the Libby Mine may become ill within months of exposure while another may remain symptom-free for decades. Some may never become ill at all. And so it was with these plaintiffs. The Miners in this case worked for the Mine anywhere from one year (Jacobson/1975-1976) to thirty-six years (Smith/1951-1987). Despite the differences in exposure, both men developed asbestosis. Mr. Smith was diagnosed in July 1998, and Mr. Jacobson was diagnosed in April 2000. Miner Graham worked for the Mine from 1962 until it closed in 1990. He died from mesothelioma in January 1998, not long after diagnosis. Although we make no finding here as to when the disease became manifest for each plaintiff, it does not appear from the record before us that any of the plaintiffs were symptomatic as early as 1973.

¶73    Prior to the adoption of the "discovery rule" in Montana and many other states, plaintiffs such as the Miners were precluded from bringing an action because the statute of limitations, formerly linked with the breach of duty element, would have expired. The "discovery rule" was adopted by the majority of states because it fairly allows injured plaintiffs to seek relief for long-dormant injuries caused by tortious conduct that occurred much earlier. Section 27-2-102, MCA.

34

¶74    In Montana, no cause of action, or suit, for negligence accrues until all elements of the claim exist. Section 27-2-102, MCA, provides:

> (1) For the purposes of statutes relating to the time within which an action must be commenced:
>
>> (a)  a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action;
>> . . . .
>
> (3)  The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
>
>> (a)  the facts constituting the claim are by their nature concealed or self-concealing;
>> . . . .

¶75    This Court has long embraced the discovery rule. *See, e.g., Johnson v. St. Patrick's Hospital* (1966), 148 Mont. 125, 417 P.2d 469. We have applied the above-stated provisions of § 27-2-102, MCA, on numerous occasions. *See Nelson v. Nelson*, 2002 MT 151, 310 Mont. 329, 50 P.3d 139 (Cause of numerous bovine vaccine injection-related illnesses not discovered for several years after negligent injection; cause of action accrued upon discovery.) *See also Gomez v. State,* 1999 MT 67, 293 Mont. 531, 975 P.2d 1258; *Hando v. PPG Industries, Inc.* (1989), 236 Mont. 493, 771 P.2d 956; *Kaeding v. W.R. Grace & Co.-CONN*, 1998 MT 160, 289 Mont. 343, 961 P.2d 1256; *Cechovic v. Hardin & Associates, Inc.* (1995), 273 Mont. 104, 902 P.2d 520.

35

¶76 While Montana's statutory version of the discovery rule governs the time within which an action must be commenced, its provisions are nonetheless instructive on the question of when a Montana cause of action accrues. A cause of action accrues "when all elements of the claim . . . exist or have occurred." Section 27-2-102(1)(a), MCA. The causes of action of the surviving Miners did not accrue until damage could be proven. And no damage could be proven until their injuries were manifest.

¶77 Two Pennsylvania cases support the proposition that the discovery rule as announced in the statute of limitations' context, should apply as well in a sovereign immunity analysis.

¶78 In *Hench v. Carpenter* (1985), 35 Pa.D. & C.3d 401, the Township's sewage officer committed a negligent act in 1976 at which time the Township did not enjoy sovereign immunity. Hench's injury from this negligent act was concealed for several years but eventually became manifest. When he sued the Township in August 1983, the Township argued that the two-year statute of limitations barred Hench's suit. Hench claimed that the two-year statute of limitations was tolled by the "discovery rule," and that his claim did not accrue until February 1983 when he discovered the injury and cause. The Township countered that by the time Hench's claim accrued under the discovery rule, the Township had enacted a sovereign immunity statute and was immune. Siding with the Township, the court agreed, stating:

> Plaintiffs claim it is the breach of the duty which gives rise to the cause of action. Since this duty was breached on June 24, 1976, they argue governmental immunity should be applied as of this date. However, the effect of the discovery rule as applied to the statute of limitations, is to delay the accrual of a cause of action from the time of defendant's negligent conduct to

when the injury becomes known or knowledgeable to the plaintiff [citation omitted]. Consequently, in this case if the discovery rule is applied for statute of limitations purposes the cause of action accrued on February 3, 1983. This is logically the point in time when the governmental immunity defense should be applied.

*Hench*, 35 Pa.D. & C.3d at 405-06.

¶79 The court further opined that the plaintiffs cannot argue for statute of limitations purposes that their cause of action did not arise until six years after the Township's negligent act, but then argue for immunity purposes that the cause of action arose at the time of the Township's negligent act. *Hench*, 35 Pa.D. & C.3d at 405-06. *See also Hurst v. East Hanover Township* (1984), 33 Pa.D. & C.3d 157. This logic is both simple and compelling. It is inconsistent to apply the discovery rule to the accrual of a cause of action for statute of limitation purposes, but then discard it when conducting a sovereign immunity analysis.

¶80 For the foregoing reasons, we conclude that the long-standing rule in Montana that civil actions are to be commenced after a cause of action has accrued, should apply to our sovereign immunity analysis here. A "suit for injury" accrues once the elements of the cause of action have accrued. The elements of the causes of action before us did not accrue until well after sovereign immunity had been abrogated. Therefore, we conclude that the existence of sovereign immunity prior to July 1, 1973, does not insulate the State from the Miners' causes of action.

## CONCLUSION

¶81 A final word about the dissent. It accuses this Court of creating a remedy out of thin air. The accusation is off the mark. First, our decision here does *not* create a duty where

37

none existed as the dissent argues; rather, it stands simply for the proposition that because the affirmative defense of immunity no longer existed at the time the Miners' causes of action accrued, it can present no bar to their causes of action. Second, this is a case with complex legal issues. The difficult questions presented by industry standards forty years old and the unusual delayed onset of the Miners' injuries advance novel questions of law. Had the issues here been simple, presumably the dissent would have said so quickly and with direct authority on point; it would not have required fifty-seven paragraphs to explain its disagreement with the majority. The simple truth is that the law attendant to these facts is both untested and arguably susceptible to different interpretations. Contrary to the dissent's insistence, we have not handed the Plaintiffs a remedy--they still face the daunting task of establishing that the State breached its duty to them and in so doing, caused their damages and injuries. What we have concluded is that a fact finder must make these determinations.

¶82     Based upon the foregoing, we conclude the District Court erred in determining that the State had no legal duty to the Miners, and in dismissing the Miners' complaints. We therefore reverse the District Court's Order of Dismissal and remand for determination by the fact-finder of whether the State breached its duty to the Miners, and if so, whether such breach caused the damages claimed by them.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

38

Justice John Warner dissents.

¶83 I dissent from the Court's Opinion and its remand of this action to the District Court. A correct interpretation of the law requires the decision of the District Court to dismiss this suit be affirmed.

¶84 Virtually all of the Miners' claims arose before the adoption of the 1972 Montana Constitution which became effective July 1, 1973. Absent the Court's innovative re-definition of the doctrine of sovereign immunity, this suit could not be maintained. Thus, I discuss this pivotal issue first, not last.

**Sovereign Immunity**

¶85 The Court concludes at ¶ 80 the doctrine of sovereign immunity does not bar Appellants' claims where the alleged breach of duty occurred prior to July 1, 1973. To reach this conclusion, the Court narrowly focuses on the words "suit for injury" contained in Article II, Section 18 of the 1972 Montana Constitution, and then equates this language to the "accrual" of an action. The result is that, because the Miners' claims for relief did not accrue until after the 1972 Constitution ended governmental immunity from suit, the doctrine of sovereign immunity does not apply.

¶86 The Court erroneously considers sovereign immunity as a simple bar to suits against the government. Thus, reasons the Court, a lawsuit that may "accrue" after the purported bar is lifted, is allowed. Focusing on the damages element of tort, the Court does not even attempt to address the issue of duty, or lack thereof, in a sovereign immunity context. The Court ignores that, because of the nature of sovereign immunity, the State had no duty

40

whatsoever to the plaintiffs and thus a tort by the State cannot be established no matter the date of the injury.

¶87　As opposed to being merely a bar to suit, sovereign immunity is a legal doctrine to the effect that actions or omissions of the government do not constitute a breach of duty owed to its citizens.  Sovereign immunity arose out of necessity to ensure the political and economic stability of the government by insulating the public treasury from suits for monetary damages.  It made no difference whether such suits were in equity, in contract or in tort.  It was deemed better that the public coffers, and thus the stability of the government, not be compromised by having to pay for something that might be done by the government to a private citizen.

> [S]hould any prince have so much weakness and ill nature . . . the inconveniency of some particular mischiefs . . . are well recompensed by the peace of the public, and security of the government . . . it being safer for the body, that some few private men should be sometimes in danger to suffer, than that the head of the republic should be easily, and upon slight occasions, exposed.

John Locke, *Two Treatises of Government*, Ch.18, (4th ed. 1764).

¶88　In feudal England the theory initially was that the king, being subject to no higher tribunal, and in that sense the ultimate maker of law, was considered incapable of wrong. As the medieval period progressed, this theory evolved and the doctrine transformed into one holding that the king, that is, the government could do wrong, but this wrong was not

41

recognized by the law.[5]  In Blackstone's terms, the doctrine of sovereign immunity was phrased:

> The supposition of law therefore is, that neither the king nor either house of parliament (collectively taken) is capable of doing any wrong; since in such cases the law feels itself incapable of furnishing any adequate remedy.  For which reason all oppressions, which may happen to spring from any branch of the sovereign power, must necessarily be out of the reach of any stated rule, or express legal provision . . . .

Blackstone, *Commentaries on the Laws of England*, vol.1, ch.7, 237-38 (1765).

¶89    In other words, even though the government might act unfairly, breach a contract or be negligent, in the eyes of our common law jurisprudence such was not a wrong that the law recognized.  This is much different, and much more, than a bar to a particular lawsuit.  The act or omission of the government simply was not wrong.

¶90    In the late-eighteenth century, the American colonists revolted and began the formation of their own government, without a monarch, and with a constitution.  Thus, in the United States there was no "sovereign" per se to whom immunity could attach.  While this may have been an opportune time to discard the doctrine, it remained firmly entrenched in the new nation.[6]

---

[5]  David E. Engdahl, *Immunity and Accountability For Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 3 (1972). The Magna Carta concept of government subject to law was born, and the phrase "the king can do no wrong" in actuality meant that the king certainly could do wrong, but would not be permitted to by the law.

[6]  "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.  This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union." Alexander Hamilton, *Federalist No. 81* (1788).

¶91 Like most states, from its territorial days Montana did not allow itself to be subject to liability for breach of a contract or for any tort.

> We hold, therefore, that unless permitted by some law of this Territory, or of the general government, no citizen of this Territory can sue it. There is no law of this Territory or act of Congress permitting it. There is, then, no legal power to enforce territorial contracts. In other words, there is no obligation to territorial contracts. They rest simply on the good faith of the Territory.

*Langford v. King* (1868), 1 Mont. 33, 38.

¶92 In Montana, the State had no obligation, that is, duty to its citizens. "Duty" and "right" are correlative terms; "where there is no duty there can be no right." John Chipman Gray, *The Nature and Sources of the Law*, 8 (2d ed., MacMillan Co. 1921). Thus, before the 1972 Constitution was adopted, a citizen had no right to seek damages against the State and the State had no correlative duty to its citizens. *See generally, Murphy v. State* (1991), 248 Mont. 82, 809 P.2d 16.

¶93 In step with the rise of the insurance age, the courts and legislatures of many states began to weaken sovereign immunity.[7] In Montana, a citizen's right to sue the State was enacted as Article II, Section 18, of the 1972 Montana Constitution. This provision became effective on July 1, 1973.

¶94 With the adoption of our new constitution, Montana citizens acquired a right to sue the State where none had existed before. This new right created the correlative duty which had not existed previously, and imposed for the first time on the Montana State Treasury an obligation to pay damages for a breach of a contract or for tortious conduct.

---

[7] Engdahl, at 59.

¶95     Now, this Court holds for the first time[8] that if one of the elements of a tort occurs subsequent to the abrogation of sovereign immunity, this sequence of events somehow transmogrifies an act or omission that was not wrong into a breach of a duty that did not exist.  By focusing on when the damage occurred, the Court forgets that at the time of the alleged breach of duty by the State, it owed no duty at all to the Miners.  Sovereign immunity is not a bar to an action, it is a legal doctrine to the effect that the government had no duty to respond in damages to its citizens for its acts or omissions.  When sovereign immunity was abolished, this changed, but by no stretch of logic or law can it be said that an act or omission done while the doctrine was in effect retroactively creates such a duty. I agree with Federal District Court Judge Molloy who, when faced with this same question, determined that  "[m]easuring the accrual of sovereign immunity based on the discovery of damage is not a principled basis for determining the scope of sovereign immunity." *Dickerman v. W.R. Grace*, CV-00-130-M-DWM, 4 (D. Mont. 2000).

¶96     Without any support from the Constitutional Convention transcripts, the Court incorrectly concludes at ¶ 70 the delegates to the 1972 Constitutional Convention actually intended the State would not be immune from any claim for relief that matured, that is, accrued after July 1, 1973.  However, the 1972 Constitutional Convention Bill Of Rights Committee made it clear that, while the doctrine of sovereign immunity was outdated and

_____

[8]  *Jacques v. Montana Nat'l Guard* (1987), 199 Mont. 493, 506-07, 649 P.2d 1319, 1326, does not stand for the proposition that an event that happened while sovereign immunity was in effect could 40 years later give rise to an action against the State.  In *Jacques* the plaintiff was injured and the damages were sustained after the legislature abrogated the doctrine.

44

unfair, there was no intention to subject the State to claims that pre-dated the new Article II, Section 18.

> The committee is well-aware that implementation of this provision could cause some difficulties if done uithout [sic, without] permitting affected agencies to upgrade their currently inadequate coverage. Accordingly, it is recommended that this provision not be retrospective in its application; that, in order to permit agencies time to obtain adequate insurance coverage as provided by legislative appropriation, it shall not be effective until June 1, 1553 [sic, 1973]; and that it shall be effective only as to causes of action arising after that date. The committee commends this provision to the convention with the belief that its adoption will insure that redress for wrongs will be administered on behalf of and against all parties, governmental as well as private.

Montana Constitutional Convention, Bill Of Rights Committee Proposal, Comments, February 23, 1972, Volume II, p. 638.

¶97 Sovereign immunity was abrogated only because insurance was available. This Court cannot be, and is not, concerned with the question of whether the potential loss is insured. However, the discussion of insurance is highly relevant to determining the intent of the delegates concerning retroactive application of Article II, Section 18. It is crystal clear it was the intention of the drafters of the 1972 Constitution that anything which had previously occurred could not give rise to lawsuits. Montana was starting with a clean slate.

¶98 The Court also ignores the plain words of the Transition Schedule, § 3, of the 1972 Constitution which states:

> Section 3. Prospective operation of declaration of rights.
> Any rights, procedural or substantive, created for the first time by Article II
> shall be prospective and not retroactive.

45

¶99 There is no question the right of a citizen to sue the State of Montana was created by Article II, Section 18, of the 1972 Constitution. There also is no question this new right was prospective only.

¶100 Further, the Court ignores the Convention Note to Transition Schedule § 3, which was drafted by a committee of the delegates and presented to the populace to educate the voters as to what each section of the new constitution was intended to accomplish. Such note states the intention of the delegates:

> Convention Notes:
> Any new rights created in Article II take effect only after July 1, 1973. It does not create any right for past events.

¶101 This is an additional acknowledgment from the delegates themselves that a new right was created with the adoption of the new constitution. It was not intended that past events would give rise to subsequent obligations by the government.

¶102 Indeed, this Court has previously recognized the prospective application of "new rights" under Article II of the 1972 Montana Constitution in another context. In connection with the right to be free from sex discrimination, another new right which was created by Article II of the 1972 Constitution, this Court held in a domestic relations case:

> Appellant cannot rely on rights arising under Article II, Section 4, 1972 Montana Constitution, for under the Transition Schedule Section 3 any "rights, procedural or substantive, created for the first time * * * shall be prospective and not retroactive."

*Rogers v. Rogers* (1976), 169 Mont. 403, 406, 548 P.2d 141, 143.

¶103 Both the right to be free from sex discrimination in *Rogers*, and the right to sue the State at issue in this case, were newly created rights in Article II. The result must be the

46

same in this case as in *Rogers*. New rights, created for the first time by the 1972 Montana Constitution, are to be enforced prospectively only.

¶104 In my view, these expressions of the intentions of the delegates cannot be avoided by the Court's reference at ¶ 71 to an 1879 statute concerning periods of limitation. Nor can such intention be avoided by referring to the dissimilar law of other states or the Federal Tort Claims Act.

¶105 It cannot be doubted that abolishing sovereign immunity is the preferred approach in these modern times. However, that is not the question before us in this case. Sovereign immunity was the law in Montana from this Court's 1868 decision in *Langford*, until July 1, 1973, at which time it was abolished with regard to future acts. I suspect millions of people in this country know about the tragic injuries to the Miners by now. I share the sympathy which necessarily must flow to them. But it is simply incorrect as a matter of law for this Court to redefine the doctrine of sovereign immunity, change it, or find a new way around it in an effort to provide a remedy. Since territorial days the people, the legislature, both of the constitutional conventions and this Court have consistently relied on sovereign immunity. Nothing that occurred, or failed to occur, prior to sovereign immunity's abolition on July 1, 1973, can properly subject the State to liability for money damages in tort.

**Legal Duty**

¶106 Notwithstanding the Court's erroneous conclusion that sovereign immunity does not defeat these Miners' claims against the State, the Court still needed to find a legal duty on the State's part in order to reach its desired conclusion that this suit is viable. It finds such duty by incomplete references and misleading quotations from statutes of yesteryear. By

innovative surgery, the Court grafts together a variety of statutory duties and foists them upon the State. However, a careful consideration of these statutes reveals that the "duties"imposed by the Court did not exist at the time the statutes were enacted, but are created only by the Court's judicial alchemy.

¶107 The Court concludes that a duty to the Miners is established because the statutes it cites created a duty running from the State to the workers. First, the Court concludes at ¶ 22 that the various statutes applied to the vermiculite mining industry. This is correct. The statutes applied to all industries and the District Court did not rule otherwise. But translating the performance of a discretionary function and the dissemination of any results, as required by statute, into a statutory duty to warn is something else entirely. The Court specifically explains in ¶ 23 this duty exists because:

> [T]he duty to gather information related to the effects upon workers or the public of conditions of employment "for diffusion among and use by the people" was never displaced or eliminated from the law. The State had the mandatory obligation from 1907 through 1999 to gather public health-related information and provide it to the people. Section 2448, RCM (1921); § 69-105, RCM (1947); renumbered in 1969 to § 69-4110(3), RCM (1947); renumbered in 1978 to § 50-1-202, MCA.

¶108 However, an accurate analysis of the entirety of these cited statutory provisions reveals a far different story about this so-called "mandatory obligation." Section 2, Ch. 110, L. 1907, consisted of a long list of powers granted to the State Board of Health which were characterized by that statute as "general supervision" and "general oversight." The particular phrase emphasized by the Court–"for diffusion among the people"–actually states, in its entirety:

48

[T]hey [the State Board of Health] shall gather such information *in respect to all these matters as they may deem proper* for diffusion among the people . . . . [Emphasis added.]

¶109   Ripping the phrase "for diffusion among the people" from the statute mid-phrase, the Court removes it from its context and from its meaning, magically turning it into a "mandatory obligation" which the Court insists existed from 1907 through 1999.  To the contrary, an accurate reading of the statute demonstrates that the power of the Board to gather what information it, in its discretion, deemed proper and to diffuse such information "among the people" was completely discretionary with the Board–to be exercised "in respect to all matters as they deem proper."  No mandatory obligation was created, because the exercise of this power was completely discretionary.

¶110   This discretionary language stayed in the statute, *see* § 69-105, RCM (1947), until the entire section was repealed in 1967 by Section 223, Chapter 197, Laws of Montana 1967.  At the same time, the language upon which the Court heavily relies, "for diffusion among the people," was repealed, and did not exist in the law after 1967, although similar language was thereafter adopted, as discussed below.   Thus, it is clear that these provisions, when studied *in toto*, merely bestowed discretionary options on the state agency, and mandated nothing.

¶111   In 1967, an entirely new statutory scheme was enacted, with language regarding the functions of the newly distinguished Board of Health and Department of Health.  From these provisions, the Court cites and relies upon § 69-4110(3), RCM (1967), to support its conclusion that the State had a continuing duty to the workers.  That statute provided:

   **69-4110.  Functions, powers and duties of department.**  *With policy guidance of the state board*, the department shall:

49

. . . .

> (3) make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups or the public . . . . [Emphasis added.]

¶112   Although this provision generally authorized the Department to make investigations and disseminate information to "persons, groups or the public," this power was to be exercised pursuant to the "policy guidance of the state board." Clearly, exercise of the power remained a discretionary function under this enactment, and a "mandatory obligation" giving rise to a legal duty was not created thereby. If the statute did not require the agency to exercise a power or to undertake a function, but rather delineated options to be exercised as the Board from time to time saw fit, such a provision cannot be construed as creating any mandatory duty whatsoever, much less a specific duty owed to the particular Miners here.

¶113   As a part of the 1967 changes to the law in question, the Legislature enacted Chapter 197, Laws of Montana 1967, Sections 19-23. These sections were codified as the new Title 69, Chapter 42, RCM, Industrial Hygiene. Taking a part of the new industrial hygiene statutes out of context, and omitting a part of the specific statute, the Court boldly states at ¶ 38 the State of Montana, by virtue of § 69-4202, RCM (1967), took upon itself a duty to correct or prevent conditions which were hazardous to health at any place of employment, and thus the State had a duty to the Miners to prevent their injuries. The clear and sweeping effect of this conclusion is that, at least during this period of time, the State undertook a legal obligation–a statutory duty in tort according to the Court–to correct all conditions which were hazardous to health, in every single place of work in Montana. Also, according to the Court, the State had a duty to prevent any recurrence of an unhealthful condition upon pain

of being liable in tort to any injured worker. A large undertaking! Indeed, one I conclude borders on the absurd.

¶114 Title 69, Chapter 42, RCM (1967), does address occupational diseases and corresponding duties. The Court, at ¶ 38, again does not reveal the entire statute. Section 69-4202, RCM (1967), stated "the state board of health shall adopt rules and make orders to correct or prevent conditions which are hazardous to health at any place of employment." Then, the next section, § 69-4203(3), RCM, requires the department of health to investigate the conditions of any place of employment at any time. Section 69-4203(4), RCM, merely requires the department to "report the findings of investigations *to the industry* concerned and *co-operate* with the industry in preventing or correcting conditions which are hazardous to health." (Emphasis added.) Section 69-4204(1), RCM, goes on to require the reporting of occupational diseases by health care providers and state employees within 11 days of discovery. Of importance, reports made "are neither public records nor open to public inspection." Section 69-4204(2), RCM. Clearly, these specific statutes regarding occupational diseases require the reports generated by the investigation are to be given to the "industry concerned" and "are neither public records nor open to public inspection." These specific statutes control as against the general statutes regarding the duties of the board. *See* § 1-2-102, MCA.

¶115 In reality, Title 69, Chapter 42, RCM, Industrial Hygiene, was in no way intended to, and did not, create a duty on the part of the State to correct or prevent all hazardous workplace conditions on pain of making the State liable for any damages if such were not completely eliminated never to recur.

51

¶116   In 1971, the Legislature enacted Chapter 316, Laws of Montana 1971, which changed the law again and created the Occupational Health Act of Montana.  This Act, in addition to the provisions cited by the Court, continued to provide that information collected by the Department concerning pollutants or operations are only for the confidential use of the Department and that only the owner or operator of an inspected premises can obtain a copy of the report on request.  *See* §§ 50-70-109(1), 115(3), MCA.  Importantly, the Occupational Health Act expressly provides that it does not:

> [A]bridge, limit, impair, create, enlarge, or otherwise affect substantively or procedurally the right of a person to damage or other relief, or otherwise affect substantively or procedurally the right of a person to damage or other relief on account of injury to persons or property and to maintain an action or other appropriate proceeding.

Section 50-70-118(3), MCA.  Thus, the expressed intention of the Legislature was not only that inspection reports were not to be disseminated, it was that the Act would not "create" or "enlarge" any procedural or substantive right to seek damages.  In determining the Act creates a special duty which exposes the State to liability, the Court abrogates this provision.

¶117   In addressing the duty issue, the District Court carefully analyzed the statutes at issue here and concluded, in part, as follows:

> Plaintiffs have pointed to a number of other statutes that have existed over the years that they feel impose a statutory duty enforceable by these Plaintiffs. However, the statutes do not specifically impose a duty on the State to protect employees from exposure from asbestos or to warn employees of the dangers of such exposure.  These statutes are very general and apply to "various industries" all over the state and do not deal with any specific hazard to be detected and prevented by the State.
>
> . . . .
>
> . . . it is critical to note that none of these statutes are specific as to the danger or the industry being addressed.  They all are very general.

52

It appears that these statutes, if they impose any duty at all, impose a directive to the Department of Health and its employees as to what their general duties are. There is nothing in any of these statutes that evidences a specific legislative concern with a particular industry or a particular type of worker. Thus, in short, the Court finds no statutory duty exists on which Plaintiffs may base their case.

¶118 The District Court's analysis is correct. These statutes do not even mention, let alone create, a duty owed by the State Department of Health to the workers of a particular industry. At best, these provisions constitute general directives to the agency itself, by which the agency is empowered to address public health problems with the industry involved. Unfortunate as it may have been, the State's actions of yesteryear were for the purpose of "working with the industry," and not directed to, or communicated with, the workers. Therefore, these efforts did not create a duty imposed on the State of Montana to warn the Miners that their health was in danger because of the defalcations of their employer.

¶119 The Court acknowledges that the State agencies in question placed great weight on Attorney General Bonner's 1942 opinion in not disseminating information to the Miners. It then concludes that they were wrong in doing so. The Court's analysis concerning this Opinion and its use is also flawed. The various health agencies were justified in their reliance on it.

¶120 The Attorney General, as acknowledged by the Court at ¶ 27, concluded that the Board of Health's reports were confidential. Although not binding on this Court, an Attorney General's ("AG's") Opinion in which the Legislature has acquiesced is persuasive and will be upheld unless palpably erroneous. *See, e.g., Stewart v. Region II Child & Fam. Servs.* (1990), 242 Mont. 88, 97, 788 P.2d 913, 919; *State ex rel. Ebel v. Schye* (1956), 130 Mont. 537, 541, 305 P.2d 350, 353; *State ex rel. Barr v. District Court* (1939), 108 Mont.

433, 436, 91 P.2d 399, 400. The Court is incorrect in its view that the AG's Opinion at issue in this case is palpably erroneous.

¶121   The issue before us, however, is not the correctness of the Opinion.  The issue is the effect of that Opinion–acquiesced in by the Legislature–on those to whom it was directed at the time and for decades thereafter. It is one thing to conclude an AG's Opinion is erroneous.  It is quite another to determine 62 years later that an Opinion was not binding at the time it was issued and, therefore, the persons who relied on it were wrong in doing so. While we have not directly addressed the issue, we indicated in *O'Shaughnessy v. Wolfe* (1984), 212 Mont. 12, 16, 685 P.2d 361, 363, that AG Opinions are binding on those requesting them or to whom they apply, absent a contrary ruling from this Court.  How can we now "unbind" those clearly bound by a 1942 AG's Opinion by our contrary opinion on the law?  What, then, is the purpose of our 80-year-old statute requiring the Montana Attorney General to provide legal opinions in writing, without fee, to those entitled by law to request them?  *See, e.g.,* § 199(6), RCM (1921); § 82-401(6), RCM (1947); § 2-15-501, MCA.

¶122   In its rush to do the right thing by the Miners in this case, the Court makes AG's Opinions not only useless, but dangerous.  What busy Attorney General in his or her right mind would continue to issue such opinions once this Court has held the persons to whom they are directed rely on them at their peril?  Having obtained an AG Opinion, should those who sought it then seek competing legal opinions, or should they merely ignore it because it may be wrong and relying on it may decades later be the basis of liability?

¶123  An examination of the AG's Opinion leads to the conclusion that it was not incorrect and most assuredly was not "palpably erroneous."  In 1939, the Legislature created the Industrial Hygiene Division of the Board of Health (IHD) and required it, among other things, to study and investigate industrial hygiene and occupation disease and "report to the *industries* concerned the findings of such investigations. . . ."  Sections 1, 2(1), (3), (5), Ch. 127, L. 1939, re-codified as §§ 69-201 through 208, RCM (1947) (emphasis added).  Section 5 of Chapter 127 required at least annual statistical summaries of all reported occupational diseases, together with dissemination of instruction and information believed appropriate to prevent the occurrence or recurrence of occupational diseases "to all *employers* of this State." (Emphasis added).  Section 7 required health care providers and certain mine inspectors, *upon request* of the secretary of the IHD, to report knowledge of any occupational disease and file a report regarding that knowledge.  Section 7 stated without equivocation that "such reports and *all records and data of the [IHD] . . .* pertaining to such diseases are hereby declared *not* to be public records or open to public inspection . . . ." Section 7, Ch. 127, L. 1939 (emphasis added).

¶124  It is clear that nothing in Chapter 127 required or even suggested public dissemination of investigations and studies by the IHD.  Those matters were to be reported to the involved industries.  Moreover, as noted above, the language of Section 7 clearly prohibited making the reports from health care providers and "all records and data of the division" public or open to public inspection.  Attorney General Bonner's Opinion in 1942 responded to a query about whether reports of workplace investigations should be furnished to anyone requesting them by relying on the clear language of Section 7.  He concluded the reports were not

public records or open to public inspection. I would conclude the Opinion was 1) not palpably erroneous, and 2) even if incorrect, binding from its issuance until today. For these reasons, I disagree with the Court's analysis of the AG's 1942 Opinion.

¶125 Nor do I agree with the Court that the re-codification and renumbering of Section 7 of Chapter 127 as § 69-207, RCM (1947), changed anything at all about the law. The language of § 69-207, RCM (1947), was identical in all respects to the former Section 7. It continued to require physicians, other health care providers and mine inspectors "having knowledge of a case of occupational disease" to report such cases "upon request" of the secretary of the IHD. More importantly, those reports "and all records and data of the division of industrial hygiene of the state of Montana pertaining to such diseases are hereby declared not to be public records or open to public inspection." The Court fails to read the statute in its entirety and according to its plain language.

¶126 Moreover, the Court is simply wrong in its unsupported statement that the presumption accorded the title of an act as expressing the Legislature's intent "applies equally to titles of sections within an act." To the contrary, it is well established in Montana that "the text of [a] statute takes precedence over the title in matters of statutory interpretation." *See, e.g., Orozco v. Day* (1997), 281 Mont. 341, 348, 934 P.2d 1009, 1012; *ISC Distributors, Inc. v. Trevor* (1995), 273 Mont. 185, 196, 903 P.2d 170, 177; *Manufacturing Acceptance Corp v. Krsul* (1968), 151 Mont. 28, 35, 438 P.2d 667, 671. Consequently, the so-called "title" of § 69-207, RCM (1947)–added by the Code Commissioner, and which speaks of a "duty of physicians and others to report cases"–cannot, and does not, impact the language contained within the statute. As discussed

56

above, in 1947, § 69-207, RCM, retained the clear "not public records" language previously contained in Section 7 of Chapter 127.

¶127   Additionally, with regard to the 1942 AG Opinion, the Court states at ¶ 30:

> [T]he language of the original § 7 interpreted by Attorney General Bonner was significantly revised by the legislature in 1967. The result of the legislative revision was to clarify § 7 in a manner that continued to prohibit health care workers from disclosing private medical records but that rendered Attorney General Bonner's Opinion moot.

¶128   As stated above, in 1967, the Legislature generally revised the laws relating to the Board of Health, amending and repealing many statutes. *See* Ch. 197, L. 1967. In doing so, the Legislature created a number of statutes under the heading "State Board of Health," which created the board and set forth its general duties, one of which was to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public." *See* Sec. 10(3), Ch. 197, L. 1967. Nothing in those statutes requires particular investigations, much less requires that results of each and every investigation be disseminated to the public.

¶129   Totally overlooked by the Court in the context of the 1942 Attorney General's Opinion is Title 69, Chapter 42, Industrial Hygiene. This chapter expressly addresses occupational diseases and corresponding duties. As previously explained, these specific statutes regarding occupational diseases require only that the reports generated by the investigation are to be given to the "industry concerned" and "are neither public records nor open to public inspection."

¶130   Thus, while I agree with the Court that the 1967 amendments retained the prohibition against disclosure of reports of occupational diseases, neither logic nor law allows me to join

the Court's next giant step. That is, I cannot agree with the Court's implicit conclusion that, because the earlier language about "division data" was deleted, thereby "mooting" that portion of the AG Opinion, there somehow sprang into being an express requirement that other occupational disease reports suddenly were required to be disseminated to the public. Nothing in the statutes at any point in their history requires it and, indeed, such an interpretation is belied by the express provision in the 1967 legislation that the findings of investigations into occupational diseases were to be reported "to the industry concerned . . . ."

¶131 Finally, with regard to the AG's Opinion, I feel compelled to express my disappointment with the Court's language at ¶ 28 when it speaks of reliance on the AG Opinion "to *justify the concealment* of the results of workplace inspections" and the statement at ¶ 30 about "the State's *decision to withhold* from the workers at the Libby Mine investigation reports." These statements clearly imply that public employees–"the State"– engaged in some sort of conspiracy to harm the Libby Miners. I am sad the Court would see fit to suggest that employees in the executive branch of government would conduct themselves in such a fashion. I disagree.

**Public Duty Doctrine**

¶132 Having invented a statutory duty, never enacted or intended by the Legislature, the Court next goes on to determine the Public Duty Doctrine does not defeat the Miners' claims because the "special relationship" exception to the doctrine applies. The Court's description of the Public Duty Doctrine, and the special relationship exception is correct. In my view,

58

however, the Court errs in concluding the special relationship exception applies in the present case.

¶133 First, and in a circular fashion, the Court states the special relationship exception applies because the statutes in question here were intended to "protect workers from occupational diseases." Although the Court correctly reasons "the lack of specificity in these statutes does not render them meaningless," a protective intent or meaning does not necessarily create a special relationship. Assuming, *arguendo*, these statutes created a duty to the Miners, even the Court does not posit these statutes applied solely to them. Thus, they cannot be said to apply to the "specific class of persons" of which the plaintiffs are members, that is, workers at the Libby mines. The statutes covered all Montana workers who were employed, in every occupation, and in every place in the State. The Public Duty Doctrine provides that if a statute creates a duty to everyone, it does not create a duty to a specific class of persons. The Court acknowledges this in ¶ 41. Yet, the Court's conclusion is that when a statute creates a duty to everyone it raises the exception to the Public Duty Doctrine because it creates a duty to a specific class of persons. Considering the very definition of the Public Duty Doctrine, I find this singularly confusing. I must disagree with the Court in this regard.

¶134 The statutes in question do not even mention, let alone create a special relationship with, the workers of a particular industry. At best, these provisions constitute general directives to the agency itself, by which the agency is empowered to address public health problems. As such, they create no "special duty that is more particular than the duty owed to the public at large." *Nelson*, ¶ 22. Nonetheless, the Court reads a special duty into these

59

provisions, an analysis which taken to its logical conclusion would create a special relationship between the State and every single Montana citizen in every place of work. Indeed, the Court determines this "special duty" exists because these statutes "were designed to protect men and women working in the various industries in Montana from occupational disease." *See* ¶ 44. Such an argument could be made about virtually any directive in the Montana Code Annotated.

¶135 Next, the Court says that a special relationship was created with the Miners because they repeatedly saw State employees making inspections and this "qualifies as a 'specific action to protect a person' and creates a special relationship between the State and the Miners." ¶ 45. The actions taken were discretionary inspections. The Miners' complaint is the State did not take any affirmative action to warn them after these inspections. Unfortunate as it may have been, the State's actions in past decades were for the purpose of "working with the industry," and not directed to, or communicated with, the workers. Therefore, these efforts cannot be considered a "specific action to protect a person."

¶136 Neither can the State's inspections be considered actions which reasonably induced detrimental reliance which would create a special relationship under the Public Duty Doctrine. *See Nelson*, ¶ 22. What the Court in essence concludes at ¶ 46 is that even though the Miners knew there was a danger, the lack of information from the State equates to the State telling them there was no danger. This erroneous conclusion is reached because the Court fixates on the inspections themselves as the "act" upon which the Miners may rely, and not on the salient point that there was no representation at all to the Miners upon which they could reasonably rely. It is every bit as logical to reason the lack of information equates

60

to the State telling the Miners there was a danger. However, the point is this: The State took no action upon which the Miners could reasonably rely which would create a special relationship between it and the Miners, and the Court's contrary conclusion appears to be a stretch for a desired result.

¶137 The workers were not told of any dangers because the law at that time prohibited such disclosure, and thus the State's discretionary decision to make inspections at Libby could not create reliance that gives rise to the necessary special relationship.

¶138 In the end, I conclude that the Court changes centuries of law on sovereign immunity, creates a mandatory statutory duty out of discretionary code provisions, and misconstrues the special relationship exception to the Public Duty Doctrine. I too wish the proper defendant was not, in all probability, judgment proof. I cannot join what is, in my view, the creation, by judicial fiat, of a remedy where the State is now substituted for a bankrupt employer.

¶139 I dissent.

/S/ JOHN WARNER


Chief Justice Karla M. Gray and Justice Jim Rice join in the foregoing dissent.


/S/ KARLA M. GRAY
/S/ JIM RICE